# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE BALDEMAR PEREZ, | CASE NO. 07cv1662 WQH |
| Petitioner, | **ORDER** |
| vs. | |
| STATE OF CALIFORNIA, | |
| Respondent. | |

HAYES, Judge:

The matter before the Court is the Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254 (Doc. #1) filed by Petitioner.

## BACKGROUND

Jose Baldemar Perez ("Petitioner"), a state prisoner proceeding *pro se*, filed the Petition challenging his state court conviction for first-degree, felony-murder with a special circumstance for personally committing the murder during an attempted robbery and a special circumstance for committing the murder for the benefit of a criminal street gang. Petitioner contends: (1) that his conviction was based on insufficient, uncorroborated accomplice testimony in violation of California Penal Code § 1111; (2) that his counsel rendered ineffective assistance at trial by failing to object to the admission of prior inconsistent statements and unsworn trial testimony; and (3) that his sentence of life without the possibility of parole, mandated by the special circumstance for felony-murder, was imposed without a meaningful basis to justify it.

**PROCEDURAL BACKGROUND**

On June 23, 2005, Petitioner was convicted by a jury of first-degree, felony-murder under Cal. Penal Code § 187(a) with a special circumstance for personally committing that murder during an attempted robbery (Cal. Penal Code § 190.2(a)(17)), as well as multiple enhancements for personally using a firearm (Cal. Penal Code §§ 12022.5, 12022.53(b)-(c)). (Lodged Document No. 4 at 2). Petitioner admitted to a criminal street gang enhancement (Cal. Penal Code § 186) and to a special circumstance for committing the murder to further the activities of a criminal street gang (Cal. Penal Code §190.2(a)(22)). (Lodged Document No. 4 at 17). The state court judge sentenced Petitioner to a term of life without the possibility of parole and an indeterminate term of twenty-five years to life to run consecutively. (Lodged Document No. 4 at 13).

Petitioner timely appealed to the California Court of Appeal, Fifth Appellate District, which affirmed Petitioner's conviction in an unpublished opinion on September 20, 2006.[1] (Lodged Document No. 4 at 2, 18). Petitioner appealed to the California Supreme Court, which denied his petition for review on December 13, 2006. (Lodged Document No. 6).

On November 19, 2007, Petitioner filed the pending Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, after exhausting the three claims of his Petition in state court. (Doc. # 1). On April 10, 2008, Respondent filed an Answer to the Petition. (Doc. # 12). On May 12, 2008, Petitioner filed a Traverse to the Answer to the Petition. (Doc. # 15).

**STATEMENT OF FACTS**

The California Court of Appeal found the facts as follows:

A. *Background*

> Defendant, Jose Guzman, Eduardo Hernandez, and Laura Holt were all charged with the first degree murder of Paul Lemos. After being arraigned, Holt

---

[1] The California Court of Appeal, Fifth Appellate District, ordered the striking of the enhancements for personal use of a firearm (Cal. Penal Code §§ 12022.5, 12022.53(b)-(c)) and for active participation in a criminal street gang (Cal. Penal Code § 186.22). (Lodged Document No. 4 at 2, 17-18).

wanted to talk to law enforcement officers. She reached a plea agreement with a prison term of 13 years in exchange for her truthful testimony at the trials of her codefendants. Guzman and Hernandez were tried together and both were convicted of murder and additional allegations. Defendant was tried separately and is the subject of this appeal. The jury was told that Holt was an accomplice as a matter of law and that her testimony required corroboration.

B. *Accomplice Testimony*

Laura Holt was with defendant, Hernandez, and Guzman on December 29, 2003. They spent part of the evening drinking at someone's house in Laton, and then Holt drove the group in her car to a basketball game in Riverdale. As it turned out, they did not attend the game; after a short period of time, they returned to Laton and went to the home of Jose Rodriguez (a.k.a.Huero).

Holt, Hernandez, Guzman and defendant smoked methamphetamine with Rodriguez, joined by Anthony Ruelas (a.k.a.Crack). Hernandez, Guzman and defendant began talking about robbing someone. Guzman asked Rodriguez for a gun. Rodriguez did not want to give it to him. Guzman told Rodriquez that he was not going to shoot the gun; he only needed it to scare someone while he robbed them. Rodriguez gave the gun to Guzman.

Holt was shown exhibit 32 at trial, a gun, and she testified it looked like the gun Rodriguez gave to Guzman.

Holt, Hernandez, Guzman and defendant left in Holt's car. Holt was driving. They drove around trying to decide where to go to rob someone. While driving around, defendant, Guzman and Hernandez talked about the robbery. They discussed stealing a vehicle with a stereo system. They drove to Hanford to find their target. They drove around the Hanford mall parking lot to look at cars. They did not find anything that suited their purposes.

Discussions continued and defendant said he wanted to do a carjacking. Hernandez wanted to do a home invasion. Guzman did not join in this discussion. The gun was passed around among the three men. Guzman and defendant argued over who was going to possess the gun. Guzman finally let defendant have his way and possess the gun. The gun had been loaded previously in the car by Guzman with defendant's assistance.

The group then drove to a residential area and looked around. Again finding nothing, they returned to the area of the mall. They saw a blue Chevrolet truck, lowered, with tinted windows, driven by Paul Lemos, the victim. Hernandez liked the truck and told Holt to follow it. She did. Holt parked her car nearby while Lemos went through the drive-through at Taco Bell and purchased food.

Holt continued to follow the truck. At one stop light the victim's truck was next to another nice truck. The group decided that the victim's truck was the nicer of the two. Defendant got out and started to go towards the truck when Guzman and Hernandez told defendant to get back in the car.

They followed the victim in his truck until the victim arrived at his house. Holt backed the car up and stopped at the end of the street. She could not see the truck from her location. Defendant and Hernandez ran towards the truck. Hernandez told Holt to follow them after they obtained the truck. Guzman got out shortly afterwards and stood near the car. Holt was not sure if Guzman

- 3 -

stayed near the car because Holt was feeling ill from the drugs and was not paying attention. She kept the engine running.

Holt heard two gunshots. Guzman got in the car. Defendant and Hernandez ran to the car and got in. They were out of breath and told Holt to take off. She did.

In the car, Hernandez complained that he was punching the victim, the victim was crying, but the victim would not give up any of his belongings. Hernandez also told defendant he should have used his hands and taken something from the victim. Defendant stated that he thought he shot the victim in the shoulder and missed with the other two shots. Holt was surprised that defendant mentioned three shots because she only heard two.

Holt drove the group back to Laton. She was told not to say anything. Holt dropped defendant off at his house so he could change his clothes and wash up to get rid of any gun residue. Holt, Hernandez, and Guzman drove back to Rodriguez's home and again used drugs. Ruelas was still there. Defendant showed up shortly thereafter. The group stayed there about an hour. During this time the gun was returned to Rodriguez. They then decided they would go to Fresno to try and find some more drugs. Their trip was unsuccessful and they returned to the home of Rodriguez and used more drugs.

Holt, Hernandez, Guzman and defendant left in Holt's car. They were stopped by police. When they were stopped, Hernandez ran and was not captured. The others discussed their alibi. They decided they would say that Holt had picked them up from City Lights in Fresno. Guzman came up with a name he would use. Officers removed them individually from the car and separated them. They were eventually allowed to leave. Holt went with Guzman to Guzman's brother's house.

Two months before trial, Holt was in a holding cell. Defendant, Hernandez, and Guzman were being held in the same area. Defendant asked Holt to take back her deal and not testify.

C. *Nonaccomplice Evidence*

Christina Padilla knew the victim. On December 29, 2003 she had a cellular telephone conversation with Lemos while she was riding in a van. She heard a scream and a deep exhale. She called his name but there was no answer. She heard the beeping sound of his truck that is made when the door is open and the keys are left in the ignition. When she was talking to him on the telephone, she did not hear him threaten anyone or challenge anyone to a fight.

Diana D. lived next door to Lemos. On the night of December 29, 2003 she was outside replacing a light bulb. She heard someone say, "Fuck you, bitch, you fuckin' scrap." She turned because she thought the person was talking to her. She saw Lemos standing by the door to his truck. Two men were standing near each other by the back of the truck. One of the individuals had a gun pointed sideways at Lemos. Diana went inside of her house. She heard three shots. She looked out and saw Lemos fall to his knees in the driveway; the other individuals ran away. She heard two car doors and heard a car "screech off." She came out of her house and saw Lemos on the ground holding the back of his head and making moaning sounds.

When Donaldson first spoke to an investigator that evening, she told

them she did not see anything. She did not want to be a "rat" and did not want the individuals to come after her. Later that evening, Donaldson told officers what she witnessed.

Donaldson identified defendant at trial as the person she saw standing by the victim's truck with the gun at the time the victim was shot.

Shirley Villagran was driving by the park and went past a small white car parked on the street. She drove farther down the street and parked on the street near the victim's house so she could talk with a friend in the car. She heard two gunshots. She saw one person get in the car. The car took off with the headlights off. Villagran followed them trying to get their license number. She stopped following the car because she was afraid. She went back to the area and told law enforcement officers what she had seen.

Hanford police officer Richard Pontecorvo responded to the scene of the murder. The truck was parked in the driveway. The driver's door was open, there was a Taco Bell bag on the ground as well as a Taco Bell cup. A cellular telephone was on the ground by the truck. The keys were in the ignition of the truck. The expensive stereo system in the truck was not missing. There were no shell casings in the area.

At 3 a.m. on December 30, 2003, Pontecorvo observed a vehicle that matched the description of the vehicle leaving the crime scene. Pontecorvo followed the vehicle. The occupants of the vehicle kept looking back at Pontecorvo as he followed it. Pontecorvo stopped the vehicle. One person fled the scene. He removed the other three occupants of the car. Holt was the driver of the car. Guzman was seated in the front passenger seat; he misidentified himself as Alex Gutierrez. Defendant was in the rear passenger seat. Holt said that she had picked up the men from City Lights in Fresno.

Lemos died from a single gunshot wound to the left side of his head. In addition, he had swelling to his right eye that was not consistent with a gunshot wound but was consistent with blunt force trauma. A deformed slug was recovered from the victim's brain.

Several days after the murder, a search was conducted at the home of Rodriguez. Rodriguez was there, as was Ruelas. In addition, Manuel Tapia and Raul Gonzalez were there. Officers found weapons, ammunition, drugs, and drug paraphernalia. Rodriguez said that he gave the gun to Guzman for protection but the gun was never returned to him.

Ruelas agreed to talk to law enforcement. He said that Rodriguez sold the gun to Raul Gonzalez. Ruelas also said that after the shooting Hernandez, Guzman, Holt, and defendant discussed the incident. The group was jittery and excited. Hernandez explained that they were going to carjack the truck. Hernandez was hitting the victim when Ruelas heard a shot. Defendant had the weapon. They ran. Ruelas told the officers that the gun was at the home of Raul Gonzalez.

The home of Raul Gonzalez was searched. The weapon was not found. Several days later Raul's brother, Robert Gonzalez, turned a weapon over to law enforcement. Robert Gonzalez is also the uncle to Manuel Tapia, one of the individuals at the home of Rodriquez when it was searched for the weapon. He said he had received a call regarding the location of the gun. He went to the location and found the gun in a paper bag by the side of the road. He refused to

provide any further details about the gun.

  A criminalist test-fired the gun turned in by Robert Gonzalez. Because the gun was worn and old he was not able to get nice crisp characteristics to compare to the fragment recovered from the victim, but the bullets agreed as far as land, grooves and twists and the bullet retrieved from the victim was consistent with being fired from the gun.

  Ralph Paolinelli, an expert on the Laton Bulldogs gang, testified that scrapa is a term used by Norteno Bulldogs to disrespect Surenos. The Laton Bulldogs do not align with either the Sureno or Norteno gangs. An officer searched the victim's bedroom. There was no indication in the room that that victim had any type of gang affiliation.

  Prior to trial, defendant admitted all gang-related enhancements, including the gang special circumstance.

(Lodged Document No. 4 at 2-8) (footnotes omitted).

## STANDARD OF REVIEW

Title 28, United States Code, § 2254(a), provides that:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution of laws or treaties of the United States.

28 U.S.C. § 2254(a). The Petition in this case was filed after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, which provides in part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Federal courts look to United States Supreme Court holdings at the time of the state court's decision to determine "clearly established federal law" under section 2254(d)(1). *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Ninth Circuit law may also be considered "for its persuasive authority in

applying [United States] Supreme Court law." *Van Tran v. Lindsey*, 212 F.3d 1143, 1154 (9th Cir. 2000), *overruled on other grounds by Lockyer*, 538 U.S. 63 (2003); *see also Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *cert. denied*, 540 U.S. 968 (2003).

A state court's decision is "contrary to" clearly established United States Supreme Court precedent if: (1) the state court applies a rule different from the governing law set forth in United States Supreme Court cases; or (2) the state court confronts a set of facts that are materially indistinguishable from a United States Supreme Court case but still reaches a different result. *Williams v. Taylor*, 529 U.S. at 405-06, 412; *Lockyer*, 538 U.S. at 73; *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Clark*, 331 F.3d at 1067. A state court decision does not have to cite to or demonstrate an awareness of clearly established United States Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002).

A state court decision may involve an "unreasonable application" of United States Supreme Court precedent "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08. Alternatively, an unreasonable application may be found "if the state court either unreasonably extends a legal principle from [United States Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Clark*, 331 F.3d at 1067. An unreasonable application of federal law requires the state court decision to be more than incorrect or erroneous. *Lockyer*, 538 U.S. at 75-76. Instead, the state court's application must be "objectively unreasonable." *Id.* at 76.

This Court gives deference to state court findings of fact and presumes them to be correct. Petitioner may only rebut the presumption of correctness with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision. *Ylst v. Nunnermaker*, 501 U.S. 797, 801-06 (1991); *see also Van Lynn v. Farmon*, 347 F.3d

735, 738 (9th Cir. 2003). However, if the dispositive state court order does not "furnish a basis for its reasoning," the federal court considering the habeas petition must conduct an independent review of the record to determine whether the state court unreasonably applied controlling federal law. *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000); *see also Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

## DISCUSSION

### I. Petitioner's Claim of Insufficient Evidence to Corroborate His Accomplice's Testimony

In Ground One, Petitioner asserts that insufficient evidence was presented at his trial to corroborate the testimony of accomplice Laura Holt that Petitioner was involved in the underlying attempted robbery, as required by California Penal Code § 1111. (Doc. # 1 at 8-13). Petitioner contends that his conviction based upon uncorroborated accomplice testimony arbitrarily deprived him of his procedural rights under state law in violation of the due process clause of the United States Constitution. *Id.* Respondent contends that Petitioner's first claim should be denied on grounds that the claim fails to raise a cognizable issue and the claim fails on the merits. (Doc. # 12 at 8).

#### *A. Non-Cognizable Issue*

Petitioner's first claim asserts that his conviction was based on the insufficiency of corroborated accomplice testimony in violation of California Penal Code § 1111. (Doc. # 1 at 8-13). Respondent contends that the state appellate court properly found that California's accomplice corroboration requirement was satisfied and that Petitioner is not entitled to habeas relief because Petitioner's claim "amounts to nothing more than an allegation of state law error." (Doc. # 12 at 8-9).

California law requires that in order for a "conviction to be had upon the testimony of an accomplice," corroborating evidence must "tend to connect the defendant with the commission of the offense." Cal. Penal Code § 1111. Corroborating evidence may be "circumstantial or slight," but it "must tend to implicate the defendant by relating to an act that is an element of the crime." *People v. McDermott*, 51 P.3d 874, 899 (Cal. 2002). If

- 8 -

07cv1662 WQH

the corroborating evidence is properly admitted and "reasonably tend[s] to connect the defendant with the commission of the crime," then "the trier of fact's determination on the issue of corroboration is binding on the reviewing court." *Id.* at 899-900. There is no equivalent federal requirement to Cal. Penal Code § 1111 that necessitates corroborating evidence in order to uphold a defendant's conviction under the United States Constitution. *Laboa v. Calderon,* 224 F.3d 972, 979 (9th Cir. 2000). Under federal law, a conviction can be upheld upon the testimony of an accomplice, without any need for corroborating evidence, as long as the jury could believe the accomplice. *See Caminetti v. United States*, 242 U.S. 470, 495 (1917); *see also United States v. Ramirez-Robles*, 386 F.3d 1234, 1245 (9th Cir. 2004). A conviction in violation of California Penal Code § 1111 will not violate the United States Constitution or federal law "to the extent that the uncorroborated testimony is not 'incredible or insubstantial on its face.'" *Laboa*, 224 F.3d at 979 (quoting *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993)).

Claims that assert only state-law violations fail to raise a cognizable issue for federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Federal habeas courts are "limited [on federal habeas review] to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. A habeas claim is non-cognizable when it asks a federal habeas court to "reexamine state-court determinations on state-law questions." *Id.* Petitioner fails to raise a cognizable issue when he attacks the "state-court factual findings on due process grounds." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996).

Petitioner's claim based on the insufficiency of uncorroborated accomplice testimony in violation of Cal. Penal Code § 1111 fails to raise a cognizable issue for federal habeas relief. *See Estelle*, 502 U.S. at 68. To the extent that Petitioner asks this federal court to examine whether the state court properly applied Cal. Penal Code § 1111 to the facts of his case, this claim does not raise an issue for federal habeas review.

**B. Federal Due Process**

Petitioner asserts that his "state created right [under California's accomplice

corroboration requirement was] arbitrarily denied in violation of due process." (Doc. # 1 at 5). Petitioner further asserts (1) that the state appellate court erroneously equated corroboration of murder with corroboration of the underlying felony, which "theaten[ed] to automatically elevate proof of murder to murder in the first degree . . . felony-murder special circumstance;" and (2) that the state appellate court's finding of sufficient corroborating evidence to support an attempted robbery, based on the break in time between the two gang members approaching the victim and then firing the gunshots, is "highly speculative." (Doc. # 1 at 5, 9, 12).

Respondent contends (1) that Petitioner was not arbitrarily denied his procedural right to due process because no state law error occurred; (2) that the state appellate court's analysis was sound because "the court relied upon entirely different evidence to corroborate the occurrence of the attempted robbery;" and (3) that the state appellate court properly applied state law when it relied upon additional evidence to support the attempted robbery. (Doc. # 12 at 12).

A federal court cannot interfere with a state court's interpretation of its own state laws unless a state law violates procedural due process by "arbitrarily depriv[ing] the defendant of a state law entitlement." *Laboa*, 224 F.3d at 979; *see also Estelle*, 502 U.S. at 67-68, 72. In this case, the state appellate court found that the requirements of Cal. Penal Code § 1111 had been satisfied. (Lodged Document No. 4 at 12-13). The state appellate court found independent evidence that "supported the inference that an attempted robbery took place" and that Defendant was linked to the attempted robbery. *Id.* at 12. The state appellate court explained:

> Defendant was clearly linked to the attempted robbery by evidence separate and apart from Holt's testimony. An eyewitness identified defendant as the person holding the gun. The gun that was likely the gun used in the crime was linked to defendant. Defendant was stopped in a car matching the description of the car that drove from the scene of the crime. Defendant made false statements to police when he was stopped. The evidence was sufficient to connect defendant to the commission of the offense "'in such a way as reasonably may satisfy a jury that the accomplice is telling the truth.'" *People v. Bunyward* (1988) 45 Cal.3d 1189, 1206 [(citing *People v. Szeto*, 623 P.2d 213, 216 (Cal. 1981))]. The fact that the attempted robbery and the murder occurred contemporaneously results in a situation where the independent evidence that corroborates the murder also acts as the evidence that corroborates the attempted robbery. The

> identification of defendant as the person holding the gun, the association of the gun to the crimes and to the defendant, the linking of defendant to the car seen fleeing the scene of the murder, simultaneously corroborate Holt's testimony that a killing and an attempted robbery occurred.

*Id.* at 12.

The state appellate court reviewed the corroborating evidence and properly found that the corroborating evidence clearly linked Petitioner to the underlying attempted robbery in compliance with Cal. Penal Code § 1111. *See id.* at 12-13. There are no grounds upon which this Court could conclude that Petitioner was arbitrarily denied a state law entitlement. *See Laboa*, 224 F.3d at 979-80. Petitioner's procedural due process rights were not violated. Petitioner's first claim is denied.

## II. Petitioner's Claim of Ineffective Assistance of Counsel

In Ground Two, Petitioner asserts that his conviction should be vacated because his counsel was ineffective, in violation of the Sixth Amendment. Petitioner asserts that his counsel unreasonably (1) failed to object to the unsworn, in-court "testimony" of witness Ruelas [which Petitioner asserts was inadmissible under Cal. Evid. Code § 710]; (2) failed to object to Ruelas's out-of-court statements to Randy Ebner, an investigator for the District Attorney's Office who interviewed Ruelas during a pre-trial investigation, which were used to impeach Ruelas at trial; (3) failed to object to Ruelas's competency to serve as a witness; and (4) failed to object to the trial judge's determination of Ruelas's competency without a hearing. (Doc. # 1 at 13-17, # 15 at 12-14). Petitioner contends that his counsel's failures to object amounted to gross prejudice because there would be insufficient evidence to corroborate Holt's testimony without Ruelas's unsworn testimony. (Doc. # 1 at 16-17).

Respondent contends (1) that counsel strategically declined to object to Ruelas's unsworn testimony to avoid Ruelas from "testify[ing] about even more incriminating facts than previously disclosed" or to avoid a delay in the trial that could adversely affect Petitioner, (2) that Petitioner waived his objection by failing to object, and (3) that Petitioner was not prejudiced by his counsel's failure to object. (Doc. # 12 at 16-17).

In order for Petitioner to prove that his counsel "was so defective as to require

reversal of a conviction," Petitioner must show (1) that his counsel's performance was deficient, falling below the objective standard of reasonableness that is guaranteed the defendant by the Sixth Amendment; and (2) that Petitioner suffered prejudice as a result of counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To satisfy the first prong of the *Strickland* test, Petitioner bears the burden of overcoming the "strong presumption that counsel's performance falls within the 'wide range of reasonable professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689). A review of the reasonableness of counsel's performance must "be evaluated from counsel's perspective at the time of the alleged error," rather than in hindsight. *Kimmelman*, 477 U.S. at 381 (citing *Strickland*, 466 U.S. at 689). In addition to satisfying the first prong, Petitioner must also show a "reasonable probability" that counsel's errors directly affected the judgment and were "so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687, 694.

The state appellate court found the facts as follows:

> Several days after the murder, a search was conducted at the home of Rodriguez. Rodriguez was there, as was Ruelas. In addition, Manuel Tapia and Raul Gonzalez were there. Officers found weapons, ammunition, drugs, and drug paraphernalia. Rodriquez said that he gave the gun to Guzman for protection but the gun was never returned to him.
>
> Ruelas agreed to talk to law enforcement. FN4. He said that Rodriguez sold the gun to Raul Gonzalez. Ruelas also said that after the shooting Hernandez, Guzman, Holt, and defendant discussed the incident. The group was jittery and excited. Hernandez explained that they were going to carjack the truck. Hernandez was hitting the victim when Ruelas heard a shot. Defendant had the weapon. They ran. Ruelas told the officers that the gun was at the home of Raul Gonzalez.
>
> FN 4. At trial, Ruelas was called as a witness. He was asked questions on the witness stand and he denied talking to the police and denied having any knowledge regarding anything to do with this crime. His prior statement to officers was admitted as impeachment and as a prior inconsistent statement. Defendant contends the prior inconsistent statement of Ruelas was inadmissible and should not be considered as corroborative proof to the testimony of the accomplice (Holt) because Ruelas refused to take the oath to testify. Acknowledging that he did not object to the admission of Ruelas's unsworn testimony, defendant argues that an objection would have been futile and, if an objection would not have been futile, it was ineffective assistance of counsel to not properly preserve the claim of error.
> . . .
> Because Holt's testimony regarding the attempted robbery was sufficiently corroborated without resort to the "testimony" of Ruelas and his inconsistent

> statement entered into evidence after he "testified," it is not necessary for us to determine the multiple issues flowing from defendant's argument that the prior inconsistent statements of Ruelas were not admissible because Ruelas did not take an oath or make an affirmation when he "testified."

(Lodged Document No. 4 at 6-7,12-13).

In the specific context of failing to object to evidence, the petitioner must show that the "claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman*, 477 U.S. at 375. While California Evidence Code § 710 requires a witness to swear an oath to tell the truth before testifying, "no constitutional provision is violated if unsworn testimony is received." *In re Katrina L.*, 247 Cal. Rptr. 754, 760 (Cal. Ct. App. 1988). This Court concludes that there are no grounds to conclude that the "testimony" of Ruelas would have been excluded had trial counsel raised an objection. In addition, Petitioner cannot show a reasonable probability that the judgment in his case would have been different had his counsel raised an objection to Ruelas's "testimony." The state appellate court reasonably determined that Ruelas's "testimony" was unnecessary to corroborate Holt's testimony or to support defendant's connection to the underlying attempted robbery. (Lodgment Document No. 4 at 12-13). Petitioner's second claim for ineffective assistance of trial counsel is denied.

**III. Petitioner's Claim that California's Felony-Murder Special Circumstances Violates the Eighth Amendment**

In Ground Three, Petitioner contends that California's felony-murder special circumstance, which mandated his sentence of life without the possibility of parole, is unconstitutional under the Eighth and Fourteenth Amendments because it fails to distinguish between defendants eligible for the death penalty and those eligible for sentences of life without the possibility of parole. (Doc. # 1 at 17-19).

Respondent contends that the Eighth Amendment mandates a narrowing requirement only for capital cases but that, even though not required to, sentences of life without the possibility of parole are sufficiently narrow to satisfy the narrowing requirement. (Doc. # 12 at 20).

The Eighth Amendment requires that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)). The United States Supreme Court has held that although the narrowing requirement is necessary to justify a capital sentence, "there is no comparable requirement" for non-capital sentences. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991). Petitioner's sentence of life without the possibility of parole is a noncapital sentence.

Even if California's felony-murder special circumstance requires a narrowing requirement to distinguish between capital sentences and life without the possibility of parole, the state appellate court properly found:

> [T]he California Supreme Court has "consistently rejected the claim that the statutory special circumstances, including the felony-murder special circumstance, do not adequately narrow the class of persons subject to the death penalty." (People v. Pollock (2004) 32 Cal.4th 1153, 1195.) The felony-murder special circumstances provide a meaningful basis for narrowing death eligibility. (People v. Lenart (2004) 32 Cal.4th 1107, 1138.) We are bound by the decisions of the California Supreme Court. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.) Having rejected the argument as to death penalty cases, the argument would clearly be rejected for cases involving the imposition of the penalty of life without the possibility of parole.

(Lodged Document No. 4 at 13).

The state appellate court's decision does not run contrary to clearly established federal law because neither the United States Constitution nor federal law mandates a narrowing requirement for non-capital sentences. *See Harmelin*, 501 U.S. at 995. Petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

It is hereby ordered that the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. #1) is DENIED. The Clerk of the Court is ordered to enter judgment in favor of Respondent and against Petitioner.

DATED: March 24, 2009

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge